## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**LESA ANN HAILA,**

      **Plaintiff,**

**vs.**                                  **Case No. 5:13cv377-CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

_____/

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a Social Security case referred to the undersigned U.S. Magistrate Judge upon consent of the parties and reference by District Judge Richard Smoak. Doc. 9. *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c). After careful consideration of the entire record, the decision of the Commissioner is affirmed.

## I. Procedural History

On November 2, 2010, Plaintiff, Lesa Ann Haila, filed an application for a period of disability and Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act, alleging disability beginning August 7, 2010, due to back and neck surgery, stomach problems, acid reflux, and Hepatitis C. R. 17, 128-33, 169. (Citations to the record shall be by the symbol "R." followed by a page number that appears in the lower right corner.) Plaintiff's application was denied initially on November 18, 2010, and upon reconsideration on January 20, 2011. R. 17, 72-75, 79-82. On March 7,

2011, Plaintiff requested a hearing.  R. 17, 83-84.

On June 5, 2012, Administrative Law Judge (ALJ) Jeffrey Marvel held a video hearing, appearing in Tallahassee, Florida, and Plaintiff appeared and testified in Panama City, Florida.  R. 17, 38-62.  Plaintiff was represented by Forrest Jackson, an attorney.  R. 17, 32, 76-78, 125-27.  Gail E. Jarrell, an impartial vocational expert, also testified.  R. 17, 63-66, 118-20 (Resume).  At the close of the hearing, the ALJ requested Plaintiff's counsel to provide a brief explaining the nature of the evidence that supported a finding of disability prior to the date last insured.  R. 67-68.

On August 1, 2012, the ALJ entered a decision denying Plaintiff's application for benefits, concluding that Plaintiff was not disabled between her alleged onset date of August 7, 2010, and her last date insured for DIB of September 30, 2010, and has the ability to return to her past relevant work as a bartender.  R. 17, 24, 140.  On September 25, 2012, Plaintiff requested the Appeals Council to review the ALJ's decision.  R. 13.  Counsel submitted a Summary of Arguments.  R. 4, 216-21.  On September 5, 2013, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner.  R. 1-6; *see* 20 C.F.R. § 404.981.  On November 8, 2013, Plaintiff filed a Complaint in this Court seeking judicial review.  Doc. 1.  The parties filed memoranda of law, docs. 14 and 15, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant last met the insured status requirements of the Social Security Act on September 30, 2010."  R. 19.

2. "The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 7, 2010 through her date last insured of September 30, 2010." *Id.*

3. "Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical and thoracic spine; facet arthropathy of the cervical and thoracic spine; and obesity." *Id.*

4. "Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 20.

5. "[T]hrough the date last insured, the claimant had the residual functional capacity [RFC] to perform light work as defined in 20 C.F.R. § 404.1567(b), except she can occasionally lift 20 pounds and frequently lift 10 pounds. She can frequently balance, stoop, kneel, crawl, and climb, but she cannot climb ladders, ropes, and/or scaffolding. She can occasionally crouch. She can stand and/or walk for 6 hours in an 8-hour workday and sit for 6 hours out of an 8-hour workday. She should avoid even moderate exposure to colds and hazards." R. 21.

6. "Through the date last insured, the claimant was capable of performing past relevant work as a bartender. This work did not require the performance of work-related activities precluded by the claimant's [RFC]." R. 24.

7. "The claimant was not under a disability, as defined in the Social Security Act, at any time from August 7, 2010, the alleged onset date, through September 20, 2010, the date last insured." *Id.*

## III. Medical and Other Evidence

### A. Introduction

At step two, the ALJ found that the medical evidence of record established Plaintiff's diagnoses and medical history of degenerative disc disease of the cervical and thoracic spine, facet arthropathy of the cervical and thoracic spine, and obesity, and that these are severe impairments. R. 19. The ALJ "reviewed evidence in the record after the claimant's date last insured in finding" these severe impairments and "viewed

the evidence in the light most favorable to the claimant."  R. 20.  At step four, and when

determining Plaintiff's RFC, the ALJ "reviewed and considered all the medical and

treatment records in the file; however, [the ALJ] has declined to rely on medical and

treatment records after the [Plaintiff's] date last insured in formulating the" RFC.  R. 22.

As a result, for the most past, the ALJ refers, in his written decision, to medical and

treatment notes prior to Plaintiff's date last insured, September 30, 2010.  R. 21-24.

The relevant evidence both prior to and after Plaintiff's date last insured is discussed

herein.

### B.  Medical and Other Evidence before September 30, 2010

On September 13, 2007, an MRI of Plaintiff's thoracic spine showed a T8-9 disc

protrusion with mild flattening of the ventral aspect of the cord; disc protrusion without

apparent neural impingement at T9-10; and focal right posterior disc protrusion of the

T12-L1 disc with thecal sac displacement, but no definite nerve root or cord

impingement.  R. 286-87; *see* R. 22.

On September 26, 2007, Plaintiff had a follow-up visit with Shawn Wu, M.D.,

Ph.D.  R. 280-81.  On physical examination, Plaintiff reported her neck pain was

constant and had not improved.  R. 280.  She had tenderness over her lower cervical

and thoracic spine.  She had a negative Spurling's maneuver (test for cervical

radiculopathy or nerve impingement) and a negative straight leg-raising test.  Dr. Wu's

impressions included: cervical disk degenerative disease, cervical facet arthropathy,

thoracic disk degenerative disease, and thoracic facet arthropathy.  *Id.*  Plaintiff was

continued on Lortab for pain, and Naproxen and Skelaxin (although they had not

significantly improved her neck pain), and was to continue using a heat pad to the neck and back 5-6 times each day as needed for pain.  *Id.*  Dr. Wu discussed with Plaintiff cervical facet joint steroid injections to manage the neck pain, secondary to cervical facet arthropathy, and Plaintiff agreed to schedule the procedure.  Dr. Wu noted Plaintiff was not in acute distress, a finding Dr. Wu repeated throughout his treatment of Plaintiff. R. 281.

On January 30, 2008, Plaintiff followed up with Dr. Wu and reported that her neck pain had significantly improved after she finished a series of cervical facet joint steroid injections on November 5, 2007.  R. 274.  Plaintiff did not have severe pain in her neck, however, she complained she still had constant pain in the mid-back, which impaired her daily activity, function, and nighttime sleeping.  Lortab had not significantly improved her mid-back pain.  Plaintiff denied any other new symptoms.  *Id.*  Plaintiff was to continue taking Lortab and Skelaxin; keep good posture in daily activities; and was told to avoid any activity which aggravated or triggered her back pain.  R. 274-75.  (The latter recommendation was repeated again on March 31, 2008, R. 268; May 22, 2008, R. 265; August 22, 2008, R. 257; October 22, 2008,  R. 259; December 22, 2008, R. 261; March 23, 2009, R. 264; and lastly on June 23, 2009, R. 256.  On each occasion, Plaintiff was not expressly told she should not work.)  Dr. Wu recommended that Plaintiff undergo steroid injections of her thoracic facet joints.  Plaintiff was described as a well-developed, well-nourished Caucasian female, in no acute distress, descriptions that were repeated in subsequent treatment notes.  R. 275.

On March 31, 2008, Plaintiff followed up with Dr. Wu.  She reported that her

medial back pain had not significantly improved after receiving a series of thoracic facet joint steroid injections on February 27, 2008.  R. 267.  Plaintiff reported her neck pain and upper back pain were constant and the pain radiated to her left upper extremity. Plaintiff also complained of constant muscle spasm which was not significantly relieved by Skelaxin.  *Id.*  Plaintiff was continued on Lortab, prescribed Amrix, and Skelaxin was discontinued.  Plaintiff was not in acute distress.  In the sitting position, Plaintiff's straight leg-raises were again negative at 30 degrees bilaterally.  *Id.*

On May 22, 2008, Plaintiff reported to Dr. Wu that her neck and upper back pain had improved in that she did not have severe pain in the neck or upper back.  R. 265. She continued taking Amrix and Lortab, which improved her pain and function.  She denied any side effects from the medications and was in no acute distress.  *Id.*

On August 22, 2008, Plaintiff reported that her neck pain had been stable, however, she complained of left low back pain that radiated to her left buttock.  R. 257. She denied numbness and tingling sensation in bilateral lower extremities.  She denied any injury in the low back.  Plaintiff continued to take Lortab and Amrix, which improved her back and neck pain.  Spurling and straight leg-raise tests were negative.  *Id.*

On October 22, 2008, Plaintiff reported that her neck and upper back pain were stable, however, her left low back pain was aggravated and the pain level was up to 7/10.  In addition to Lortab and Amrix, Plaintiff was prescribed Mobic.  R. 259.

On December 22, 2008, Plaintiff reported that her neck and low back pain had resolved, however, she still had intermittent upper back pain that was not severe and her pain level was up to 5 to 6-10.  R. 261.  Lortab and Amrix continued to improve her

upper back pain and she improved her function.  Dr. Wu's impressions were thoracic
disk degenerative disease and thoracic facet arthropathy.  *Id.*

On March 23, 2009, Plaintiff reported her neck and back pain had been stable.
She continued taking Lortab, Amrix, and Mobic, and denied any new symptoms.
R. 263.  Dr. Wu added the following impressions to the two previous impressions: left
sacroiliac dysfunction and lumbar disk degenerative disease.  *Id.*

On June 23, 2009, Plaintiff complained that her neck and mid-back pain were
intermittently aggravated and the pain level was up to 6-7/10, although her low back
pain had been stable.  Dr. Wu's impressions included: cervical disk degenerative
disease; cervical facet arthropathy; thoracic disk degenerative disease; thoracic facet
arthropathy; lumbar disk degenerative disease; lumbar facet nephropathy; and bilateral
sacroiliac joint dysfunction.  R. 255.  Plaintiff was to continue taking Lortab for her neck
and back pain, Amrix, and was prescribed Flexeril after Plaintiff finished Amrix.  *Id.*
Dr. Wu recommended, for the last time, that Plaintiff keep good posture and avoid
activity that would aggravate or trigger her back pain.  R. 256; *see* R. 243-44 (Dec. 30,
2009, neck pain intermittently aggravated; back pain stable).

On January 28, 2010, Plaintiff received three cervical facet joint steroid injections
and reported that her pain level prior to the injection was at 8/10 and after her pain level
was 2/10.  R. 249.

On February 4 and 11, 2010, Plaintiff received more injections and her pain level
was 7/10 and 6/10, respectively, and reduced both times to 2/10.  R. 251.

On March 12, 2010, Plaintiff reported her neck pain had not improved after

receiving the injections and she still had constant pain that radiated to her bilateral shoulders.  R. 245.  She also reported upper back pain and her neck and upper back pain level remained at 7/10.  She continued taking Lortab, Amrix, and ibuprofen, which had not significantly improved her neck pain.  She reported that her neck pain impaired her daily activities, function, and nighttime sleeping, and she was unable to go back to work due to the neck pain.  Plaintiff is described as well-developed, well-nourished, and not in acute distress.  Dr. Wu did not recommend that Plaintiff not work.  *Id*.

On May 27, 2010, Plaintiff complained that her neck pain had been aggravated and the pain level was up to 7 to 8/10.  R. 247.  Plaintiff discontinued taking Embeda at the end of March and only took Lortab.  Plaintiff complained her neck pain had been aggravated after she discontinued Embeda and hoped to restart Embeda.  Plaintiff was re-prescribed Embeda and continued on Lortab for breakthrough back and neck pain.  *Id*.

On July 27, 2010, Plaintiff reported that her neck pain had been intermittently aggravated and the pain level was up to 6-7/10.  R. 239.  She continued to deny side effects from her medications.  Plaintiff also complained of constant muscle spasms in her right posterior neck.  *Id*.  A posterior neck examination and back examination revealed the following:

> POSTERIOR NECK EXAMINATION: A reduced cervical lordosis is appreciated. Tenderness is noted overlying cervical spinous processes and right cervical paraspinal muscle and right trapezius muscle.  Scapulothoracic movements are equal.  Spurling test is negative bilaterally.  Extension of cervical induces the neck pain.

> BACK EXAMINATION: In standing, the patient has reduced cervical lordosis,

normal thoracic kyphosis and lumbar lordosis.  Shoulders and pelvis are level.
Focal tenderness is noted in upper thoracic spinous processes.  No tenderness
is noted in lumbar spinous processes, sacral spinous processes, bilateral
sacroiliac joints, greater trochanters or ischial tuberosities.  In the sitting position,
straight leg raise is negative at 30 degrees bilaterally.

*Id.  Cf.* R. 233 (Oct. 28, 2010, physical examination).  Dr. Wu's impressions included:

cervical disk degenerative disease, cervical facet arthropathy, cervical dystonia, thoracic

disk degenerative disease, and thoracic facet arthropathy.  *Id.*  Plaintiff was continued

on Embeda for neck and back pain, Lortab for breakthrough back and neck pain, Amrix,

and ibuprofen.  *Id.*

On September 28, 2010, Plaintiff presented with cervical dystonia, which has

caused constant cervical spasm and constant neck pain.  R. 237.  Plaintiff received a

scheduled Botox injection of cervical muscles.  Plaintiff was described as a well-

developed and well-nourished woman, in no acute distress; she is alert and oriented

x 3.  Tenderness and spasm are noted in her posterior cervical muscles.  *Id.*  Plaintiff

was not advised regarding her posture and to avoid activities that aggravated or

triggered her back pain.  *Id.*

### C.  Medical and Other Evidence after September 30, 2010

On October 28, 2010, Plaintiff followed up with Dr. Wu and reported that her neck

pain had not improved, although she reported that her cervical muscle spasm had

improved.  Her neck pain level was up to 7/10.  She reported side effects from Amrix,

but hoped to change to a different pain medication.  R. 233.  Dr. Wu reviewed Plaintiff's

12 systems and she reported neck and upper back pain, although all other systems

were negative.  The results of the posterior neck and back examinations were similar to

the July 27, 2010, results.  R. 233, 239.

On December 29, 2010, Plaintiff returned for a follow-up visit.  R. 464.  She complained her mid-back pain had been aggravated and the pain level was up to 7/10 and neck pain had been stable with neck pain level up to 5-6/10.  R. 464-65.  She continued taking OxyContin and Lortab for neck and upper back pain and also took ibuprofen and Amrix.  She denied any new symptoms and side effects from medications.  Plaintiff complained her mid-back pain impaired her daily activity, function, and nighttime sleeping.  The results of a posterior neck and back physical examination were noted.  Dr. Wu also reported results of his neurologic examination:

> The patient is alert and oriented x 3.  Affect is appropriate.  Manual muscle testing of bilateral upper and bilateral lower extremities shows muscle strength 5/5 throughout without focal motor deficit.  Light touch and pinprick sensation is intact in upper and lower extremities.  Muscle stretch reflexes are 2/4 in biceps, triceps, brachioradialis, patellar, and Achilles bilaterally.  No ankle clonus is elicited.

R. 465.  Plaintiff was continued on her medications.  *Id.*

On February 28, 2011, Plaintiff followed up with Dr. Wu after receiving thoracic facet joint steroid injection at bilateral T8-T9, T9-T10, and T10-T11, R. 440, 481. R. 466.  Plaintiff reported that her mid-back pain had improved for 65 percent after she finished the injection treatment on January 18, 2011.  At the time of the examination, her mid-back pain level was still up to 5/10, her neck pain had been aggravated with a pain level of up to 7/10, and low-back pain level was up to 4/10.  She continued taking her medications.  The results of her physical examination, including her neurologic examination, are similar to prior results.  R. 466-67.

On April 29, 2011, Plaintiff made similar complaints and continued to take her medications.  R. 468.  She complained her muscle spasm did not improve with Amrix and hoped to try a different muscle relaxer.  She continued to complain that her neck pain impaired her daily activity, function, and nighttime sleeping and that she was unable to resume her job duties.  *Id.*  The results of the physical and neurological examinations are similar to prior results.  R. 469.  She was continued on OxyContin, Lortab, and ibuprofen.  Amrix was discontinued and Zanaflex was prescribed for muscle spasm.  Joint and trigger point injections were discussed.  *Id.*

On June 29, 2011, following injections on May 27, 2011, R. 482-83, Plaintiff reported her neck pain had not improved.  R. 471.  Her neck pain level was still up to 7/10, and her back pain had been stable with back pain level up to 4-5/10.  She reported continuing taking her medication, denied side effects from medications, and denied any new symptoms.  Examination results were similar to prior results.  R. 471-72.  The dosage of OxyContin was increased for her neck and back pain; she was continued on Lortab for breakthrough neck and back pain; and continued on Zanaflex and ibuprofen.  R. 472.

Plaintiff continued to follow-up with Dr. Wu from August 30, 2011, through April 21, 2012, for medication management appointments.  R. 434-39, 474-76, 500-03.  Plaintiff again subjectively complained of variable neck and upper back pain.  Dr. Wu again observed her to be in no acute distress and physical examinations consistently showed negative Spurling's and straight leg-raising test; Patrick tests (for arthritis of the hips) were positive bilaterally; she had full muscle strength in her upper and lower

extremities without focal motor deficit; and sensation and reflexes were intact.  *Id.*  On

February 21, 2012, and April 19, 2012, Plaintiff had thoracic facet joint steroid injections.

R. 500-03.  Prior to the injections, Plaintiff reported pain at 8/10.  At the time she left

Dr. Wu's office, Plaintiff indicated her pain was at 1/10.  *Id.*

### D.  Other Medical Treatment

In addition to seeing Dr. Wu for pain management, Plaintiff also saw her primary

care physicians for management of her general medical needs, interspersed with

emergency department notes from, for example, Jackson Hospital.  *See, e.g.*, R. 332-

48, 350-401, 404-29, 505-06.[1]  Plaintiff sought conservative treatment for several non-

severe impairments, including a hiatal hernia, acute sinusitis, Hepatitis C, COPD,

GERD, and hypertension.  R. 222-29, 332-48, 350-69, 371-72, 404-49.  Treatment

records showed that Plaintiff's non-severe impairments improved with conservative

treatment and they did not set forth any findings that would support significant functional

limitations.  R. 332-48, 404-29.

In addition, there is no evidence that Plaintiff experienced any mental health

---

[1]  On February 13, 2012, Plaintiff presented to the emergency department at
Jackson Hospital complaining of nausea, vomiting, and headache.  R. 376.  Plaintiff
denied "any medical problems."  *Id.*  Under "musculoskeletal," it is noted: "Negative for
neck pain."  History of chronic back pain is noted.  R. 377.  Under "psychiatric," it is
noted: "Negative for anxiety, depression and agitation."  R. 379.  Notwithstanding a
noted history of anxiety, R. 377, Plaintiff is described as being alert, not confused; she
was oriented to person, place, and time; memory was intact; normal motor function was
present; right and left knee reflex was 2 plus; sensory exam was negative for touch and
position deficit.  R. 379.  There was no costovertebral angle tenderness regarding her
back.  *Id.*  Discharge impressions included ethmoid sinusitis and headache.  Plaintiff
was discharged the same day.  R. 385; *see* R. 395-401 (July 17, 2011, emergency
department visit complaining of chest pain).

issues prior to September 30, 2010, her date last insured.  During a field office interview in November 2010, Plaintiff stated that she did not have any mental health issues that interfered with her ability to work.  R. 176.

In and around September 2011, Plaintiff began treating at Everest Medical Care (Everest) for general medical issues.  R. 426.  At that time, she presented with weakness; history of fall; and also complained of anxiety secondary to relationship difficulties and multiple court processes.  *Id.*  A note stated that Plaintiff was placed on Lyrica approximately three months ago and Plaintiff has had problems with anger issues since taking the medication.  Plaintiff voiced complaints of severe anxiety and stated her current medication was not effective.  Chronic neck and back pain since 2004 and her treatment by pain management are noted. "This pain is stated to be the result of Physical abuse.  Is currently attempting to get disability r/t inability to work."  *Id.* Musculoskeletal tests were negative for arthralgias, back pain, and myalgias. Neurological tests were positive for weakness (generalized history of falls).  *Id.* (Another musculoskeletal note stated: normal gait; grossly normal tone and muscle strength; range of motion was decreased with neck forward flexion, lateral flexion, and rotation; pain with neck lateral flexion and rotation.  R. 428.)  The psychiatric category noted positive for anxiety, crying spells, and feelings of stress.  *Id.*  (Another psychiatric note stated: mental status alert and oriented x 3; mood/affect was anxious and tearful. R. 428.)  The assessment included anxiety with depression, muscle weakness; generalized anxiety disorder, history of fall; other chronic pain, and PSVT.  R. 428. Plaintiff was not taking any medications, although her prior medications are stated.

R. 427, 429.  Plaintiff was prescribed BuSpar and Xanax and referred for a psychiatric evaluation, but there is no evidence that she followed up with a mental health professional.  R. 429.

Plaintiff had follow-up appointments at Everest on October 27, 2011, R. 421-23, when she was described as alert and oriented x3 and her mood/affect were anxious and tearful, R, 422; on December 29, 2011, when she is described as positive for anxiety and feelings of stress, but negative for crying spells, depression, personality change, recreational drug use, sadness, sleep disturbance, and suicidal thoughts, R. 428-420; and on February 14, 2012, when similar psychiatric observations are noted, including that Plaintiff was alert and oriented x 3 and her mood/affect was anxious tearful, good insight and judgment, R. 416-17.  It was also indicated in the February 14, 2012, notes that Plaintiff had an appointment with Dr. McDowel the next morning and that Plaintiff may continue on Xanax as suggested for now.  R. 417.

During her most recent appointment on May 30, 2012, she was positive for anxiety, but negative for crying spells, feelings of stress, difficulty concentrating, sadness, sleep disturbance, or suicidal thoughts and her mental status examination was grossly normal.  Plaintiff's mental status was described as alert and oriented x 3, appropriate affect and demeanor, and good insight and judgment.  Plaintiff's gait was slowed; she had pain with back flexion and extension; and crepitus, tenderness.  The assessment was generalized anxiety disorder.  Xanax was re-filled.  Plaintiff was negative for arthralgias, back pain, and myalgias regarding her musculoskeletal system and negative for dizziness, headaches, paresthesias, and weakness regarding her

neurological system.  R. 505-06.

### E.  State Agency Physician Debra Troiano, M.D.-Non-Examination Results

On January 19, 2011, Dr. Troiano reviewed Plaintiff's medical records and
assessed her RFC through September 30, 2010.  R. 321-28.  Dr. Troiano opined that
Plaintiff could lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds
frequently; and sit, stand, or walk about six hours out of an eight-hour day.  R. 322.
Dr. Troiano further assessed that Plaintiff could frequently climb ramps or stairs,
balance, stoop, kneel, and crawl and occasionally crouch (limited to 1/3 of the work
day), but she should never climb ladders, ropes, or scaffolds, and she should avoid
even moderate exposure to extreme cold and hazards.  R. 323-25.  Dr. Troiano
reasoned the MRIs showed no stenosis or neural impingement and Plaintiff's physical
examinations were unremarkable revealing negative straight leg-raising tests, no
paralumbar spasm, full strength, and intact sensation in coordination.  R. 322.

### F.  Plaintiff's Hearing Testimony and Other Reports

The ALJ summarized Plaintiff's hearing testimony, supplemented by other
information derived from pre-hearing reports:

> The claimant is a forty-five old woman with a general equivalency diploma.
> She is asserting disability due to a combination of allegedly debilitating
> impairments and associated symptomology (Exhibits 3E; 8E; 12; Hearing
> Testimony).  The claimant alleges that as a result of substantial limitations in her
> mobility, exertional, and nonexertional abilities caused by her severe medically
> determinable impairments that include degenerative disc disease of the cervical
> and thoracic spine, facet arthropathy of the cervical and thoracic spine, and
> obesity, she is unable to return to any of her previous work, and/or any other job
> in the national and/or local economy.

> The claimant alleges physical limitations that include severe back pain, severe

neck pain, severe shoulder pain, severe abdominal pain, difficulty lifting, difficulty
bending, difficulty sitting, difficulty standing, difficulty ambulating, and associated
symptoms of degenerative disc disease of the cervical and thoracic spine, facet
arthropathy of the cervical and thoracic spine, obesity, acute sinusitis, hiatal
hernia, history of Hepatitis C, chronic obstructive pulmonary disease,
gastroesophageal reflux disease, and hypertension (Exhibits 3E; 8E; 12; Hearing
Testimony).  The claimant reports taking amrix, beneicart, flexeril, oxycodone,
protonix, spiriva, and zanax for associated pain, inflammation, muscle spasms,
and shortness of breath.  She reports medication side effects consisting of
dizziness, nausea, drowsiness, and difficulty focusing (Exhibits 3E; 8E; 12;
Hearing Testimony).  The objective medical evidence of record does <u>not</u> support
the claimant's allegations regarding the intensity, persistence, and limiting effects
of her symptoms.

R. 21-22; *see* R. 38-62.

        In addition, Plaintiff testified to working most recently in 2009 as a cashier which

lasted approximately a week due her inability to fulfill the duties.  R. 39, R. 140-56 (work

history); *see* R. 170 (Plaintiff's description of past work).  She was fired because she

could not lift the cases of sodas and beer to stock the coolers.  She was also unable to

"dip the gas pumps to read them" due to her neck and back. R. 46.  Prior to her brief

work as a cashier, Plaintiff worked as a cook in 2007 for a short period of time and a

kitchen manager.  R. 40-41.  The longest time she held a job as a kitchen manager and

cook was between 1995 and 2000, off and on for 5½ years, at what appears to be a bar

and grill or lounge.  *Id.*  When she worked as a cook, she lifted and carried things that

weighed more than 25 pounds.  R. 41.  She also worked as a bartender, but did no

heavy work, except she was on her feet all day.  R. 42.  Plaintiff stated that she had so

many different jobs because of her drug and alcohol use.  The drug and alcohol use

stopped in 2001 when she moved away from south Florida.  *Id.*

        Starting in 2002 into 2003, Plaintiff held several jobs.  R. 42-43.  She remarried

and did not have to work, but started to work part-time for FEMA after Hurricane

Katrina.  R. 43.  (She wrote tickets for the debris to be carried away.  She examined the

property to make sure there were no hazards before the crew actually went on the site.

Her title was Debris Monitor.  R. 62-63.)  She continued to hold several different jobs in

2003 through 2005 and the ALJ inquired why she had held so many jobs in this time

frame that resembled her job pattern when she was using drugs and alcohol.  *Id.*

During this time, her husband did not have a driver's license and she was driving them

back and forth from Graceville to Panama City to work, which accounted for her

temporary jobs.  *Id.*  Plaintiff stated that she had back and neck pain, high blood

pressure, and asthma during this timeframe.  R. 44.  She used a breathing machine

when she was working.  R. 45.  Plaintiff stated that she has not had any surgeries, but

has had many injections (over 300 shots) in her back and neck and has taken pain

medications prescribed by Dr. Wu.  R. 47.

Plaintiff testified to undergoing a sleep study, with normal results.  R. 49.  She

has been diagnosed with Hepatitis C in 2005 or 2006.  R. 50.  She suffers from fatigue

and sharp pains in her liver area as a result of Hepatitis C.  Plaintiff previously had

medical insurance through her husband's employer.  R. 51.  Her doctor has told her that

her Hepatitis C was in the moderate stages, but advancing quickly.  R. 52.

Plaintiff testified that she also suffers from anxiety and depression.  R. 54.  She

takes Xanax twice per day, which is prescribed by her primary care doctor at Everest

Medical Center.  She suffered from anxiety and depression when she was younger as

well which led to drug and alcohol use.  R. 55.

Plaintiff lives in a trailer with her husband.  Her husband had been laid off from working as an electrician in February 2012 and had not worked since then.  R. 55.  Plaintiff receives $200 per month in food stamps.  R. 56.

Plaintiff stated that she is not able to complete household chores due to back and neck pain, and that it takes her approximately an hour to an hour and a half to wash dishes, and that she takes breaks while washing them.  R. 57.  Plaintiff stated that her pain is constant and ranks approximately 8-8 1/2 on a ten point scale.  Bending or lifting her legs to get in and out of a car aggravates her pain.  Plaintiff stated that she does not sleep at night and during the day she lies down approximately three to four hours. R. 59.  She lies down to stretch her back.  R. 60.  She has good days and bad days and that on the bad days she knots up and has muscle spasms everywhere. *Id.*

Plaintiff testified that she requires having someone with her at all times.  *Id.*  Her daughter comes over to help out when her husband is not there.  R. 61.  She has another daughter and a son-in-law that live next door.  *Id.*

Regarding her medications, Plaintiff testified that the side effects affect her ability to drive, and causes her dizziness, drowsiness, and nausea.  *Id.*  She also testified to being in the middle of a conversation and forgetting what she is talking about.  *Id.*

### G.  The ALJ's Credibility Findings

At step four, and as part of his RFC assessment, the ALJ made the following credibility findings after summarizing relevant evidence from between September 2007 and October 2010, R. 21-23:

Inconsistent reports and testimony from the claimant and the fact that the record contains observations of generally stable examination findings, with some improvement in condition when compliant with conservative treatment, detract from the credibility of the claimant's allegations as to her functional limitations and the severity of her alleged symptoms.  While the above referenced inconsistencies may not have been the product of a conscious attempt to mislead on the part of the claimant, they nonetheless undermine the credibility of her allegations in reporting her activities of daily living and functional abilities.  Accordingly, the undersigned finds the claimant's allegations are not entirely credible pursuant to Social Security Ruling 96-7p.

R. 23.

## H.  Testimony of the Vocational Expert

The vocational expert, Gail Jarrell, testified during the hearing.  R. 63.

Ms. Gerald described Plaintiff's past relevant work history: (1) ticket clerk, light exertion, skilled, with an SVP of 2; (2) kitchen manager, median exertion, skilled, with an SVP of 7; (3) a cook, medium exertion, skilled, with an SVP of 6; and (4) bartender, light exertion, semi-skilled, with an SVP of 3, and performed at the light level.  She performed the jobs of cook and paperwork from the light to medium levels, kitchen manager at the medium level, and ticket-taker at the light level.  R. 63-64.  The ALJ posed the following hypothetical:

Okay.  Let's assume a hypothetical individual with the age, education, and past work experience of this claimant, who can occasionally lift 20 pounds and frequently 10 pounds, stand and walk for six hours out of an eight-hour day and sit for six hours out of an eight-hour day, who can frequently balance, stoop, kneel, crawl, and climb; no climbing of ladders, ropes or scaffolding; could occasionally crouch; should avoid even moderate exposure to cold and moderate exposure to hazards.  Could such an individual perform any of the claimant's past work?

R. 64.  Ms. Jarrell testified that the hypothetical person could perform the job of bartender.  R. 64-65.

Plaintiff's counsel asked the following hypothetical:

> If we had a hypothetical individual with the same age, educational background, and work history as the claimant, and I'll assume the same limitations as the judge articulated in his hypothetical, with the additional limitations that they would experience moderately severe to severe pain on a daily basis, which would prevent her ability to sustain concentration persistence and pace for two-hour periods or for an eight-hour workday, and also that she would need to lie down due to this pain off and on for approximately two hours out of an eight-hour workday.  Would such an individual be able to perform the claimant's past work or any other work in the regional or national economy?

R. 65.  Mr. Jarrell responded "[a]bsolutely not."  R. 66.

## IV.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[3]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a

weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[3]  A residual functional capacity (RFC) is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c).

severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## V.  Legal Analysis

### A.  The ALJ Properly Considered Relevant Evidence in Determining Whether Plaintiff is Disabled

Plaintiff argues that the ALJ should have considered the medical evidence after her date last insured to determine whether she was disabled prior to the date.  Doc. 14 at 6-9.  Plaintiff further argues that the ALJ's consideration of the opinion of non-examining consultant, Dr. Troiano, dated January 19, 2011, is inconsistent "with the ALJ's governing statement as to how he reached the ultimate finding of [Plaintiff's RFC]."  Doc. 14 at 7.

At step two, the ALJ found that the medical evidence of record established the claimant's diagnoses and medical history of degenerative disc disease of the cervical and thoracic spine, facet arthropathy of the cervical and thoracic spine, and obesity and that these are severe impairments.  R. 19.  The ALJ "reviewed evidence in the record *after* the claimant's date last insured in finding" these severe impairments and "viewed the evidence in the light most favorable to the claimant."  R. 20 (emphasis added).  At step four, and when determining Plaintiff's RFC, the ALJ "reviewed and considered all the medical and treatment records in the file; however, [the ALJ] *has declined to rely on medical and treatment records after the [Plaintiff's] date last insured in formulating the"* RFC.  R. 22 (emphasis added).  As a result, for the most past, the ALJ refers, in his written decision, to medical and treatment notes *prior* to Plaintiff's date last insured, September 30, 2010.  R. 21-24 (emphasis added).

The burden is on the claimant to prove that she is disabled.  <u>Bell v. Bowen</u>, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); <u>Wilkinson v. Bowen</u>, 847 F.2d 660, 663 (11th Cir. 1987).  Social Security's DIB program is similar to other insurance programs in that to qualify, a claimant must have coverage to be fully insured at the time of disability.  "In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  In addition, an individual is entitled to DIB *if* she is under a disability *prior* to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).

In this case, Plaintiff alleged that she became disabled on August 7, 2010, and her insured status expired on September 30, 2010.  The ALJ considered all of the medical and treatment records in the file, but determined that the evidence prior to Plaintiff's date last insured demonstrated that Plaintiff was not disabled.  R. 20, 22.  In reviewing the evidence post-dating Plaintiff date last insured, the ALJ viewed the evidence in the light most favorable to Plaintiff.  R. 20.

Plaintiff relies on Bird v. Commissioner of Social Security Administration, 699 F.3d 337 (4th Cir. 2012), in support of her argument that the ALJ should have

considered the evidence after her date last insured to evaluate her impairments prior to that date.  Plaintiff's reliance on <u>Bird</u> is misplaced.  In <u>Bird</u>, there were no medical records prior to the plaintiff's date last insured.  *Id.* at 339.  The earliest medical evidence occurred more than one year after the plaintiff's date last insured, when the plaintiff began treatment with the Veterans Administration (VA) and subsequently obtained a VA rating of disability.  *Id.*  Based on these facts, the Fourth Circuit concluded that the ALJ should have given retrospective consideration to the medical evidence after the plaintiff's date last insured.  *Id.* at 341.

Unlike the facts in <u>Bird</u>, medical evidence here, including the treatment notes from Dr. Wu, indicated Plaintiff's impairments began to surface in September 2007 and continued through and after her date last insured in September 2010.  *See supra* at 3-14.  As discussed herein, pain management records from Dr. Wu showed that Plaintiff's neck and back pain (either or both) showed some improvement in January and May 2008 after she received cervical and thoracic joint injections.  R. 22, 265, 274.  Her neck pain symptoms were stable in August 2008, although she complained of left low back pain.  R. 257.  In October 2008, Plaintiff reported her neck and upper back pain were stable, although her left low back pain was aggravated.  R. 259.  In December 2008, Plaintiff reported her neck and low back pain had resolved, although she still had intermittent upper back pain that was not severe.  R. 261.

In March 2009, Plaintiff's neck and back pain had been stable.  In June 2009, Plaintiff complained that her neck and back pain were intermittently aggravated, although her low back pain had been stable.  R. 263.  In January 2010, Plaintiff reported

her pain level was reduced for 8/10 to 2/10 after receiving the joint injections.  R. 249;
*see* R. 251 (February 4 and 11, 2010-same).

In March 2010, Plaintiff reported her neck pain had not improved after receiving
injections and she still had constant pain that radiated to her bilateral shoulders.
R. 245.  She reported that her neck pain impaired her daily activities, function, and
nighttime sleeping and she was unable to work due to her neck pain.  *Id.*  In May and
July 2010, Plaintiff reported her neck pain had been aggravated.  R. 239, 247.  In
September 2010, Plaintiff presented with cervical dystonia, which caused constant
cervical spasm and constant neck pain according to Dr. Wu.  Plaintiff was described as
a well-developed and well-nourished woman, in no acute distress and alert and oriented
x3.  Tenderness and spasm are noted in her posterior cervical muscles.  Dr. Wu did not
advise Plaintiff regarding her posture in daily activities and to avoid any activity which
aggravated or triggered her back pain as he did in 2008 and 2009.  *See supra* at 5.

Treatment notes from Plaintiff's primary care provider between May 2009 and
October 2010 demonstrate that her non-severe impairments were controlled with
conservative treatment and did not result in any significant limitations (other than as
reported by Plaintiff).  R. 20, 332-48.

Generally, records post-dating Plaintiff's date last insured did not document
progressive worsening of her symptoms.  Reported symptoms were similar including
aggravation and stability of neck and back pain.  Despite Plaintiff's subjective
complaints of variable pain in her neck and upper back, her physical examinations
remained relatively stable and unremarkable.  R. 23.  Dr. Wu routinely observed Plaintiff

to be in no acute distress with normal strength in her upper and lower extremities, intact

sensation and reflexes, and negative Spurling's maneuver.  R. 434-48, 464-75.  For

example, in December 2010, Plaintiff reported mid-back pain that was aggravated with

a pain level up to 7/10 and stable neck pain with a pain level of 5-6/10, and Plaintiff

complained that her mid-back pain impaired her daily activities, function, and nighttime

sleeping.  Dr. Wu reviewed Plaintiff's 12 systems and noted that Plaintiff reported

aggravation of the upper back pain and stable neck pain, with all other systems

negative.  R. 464.  Dr. Wu noted his findings from his physical examination stating, in

part, that, in general, Plaintiff was not in acute distress.  *Id.*  Other findings included:

> POSTERIOR NECK: Reduced cervical lordosis is appreciated.  Tenderness is
> noted overlying cervical spinous process.  Scapulothoracic movements are
> equal.  Spurling test is negative bilaterally.  Extension of cervical spine induces
> neck pain.  Tenderness also is noted in bilateral trapezius muscles.
>
> BACK: In standing, the patient has reduced cervical lordosis, normal thoracic
> kyphosis, and lumbar lordosis.  Shoulders and pelvis are level.  Focal tenderness
> is noted in upper spinous processes.  No tenderness is noted in the lumbar
> sacral spinous processes and bilateral sacroiliac joints, greater trochanters or
> ischial tuberosities.  In the sitting position, straight leg raises are negative at 30
> degrees bilaterally.  Extension of the thoracic spine aggravates the upper back
> pain.
>
> NEUROLOGIC: The patient is alert and oriented x 3.  Affect is appropriate.
> Manual muscle testing of bilateral upper and bilateral lower extremities shows
> muscle strength 5/5 throughout without focal motor deficit.  Light touch and
> pinprick sensation is intact in upper and lower extremities.  Muscle stretch
> reflexes are 2/4 in biceps, triceps, brachioradialis, patellar, and Achilles
> bilaterally.  No ankle clonus is elicited.

R. 464-65.  Plaintiff was continued on OxyContin for neck and upper back pain;

continued on Lortab for breakthrough neck and upper back pain; continued on Amrix

and ibuprofen; and treatment with another round of injections was discussed.  R. 465.

Plaintiff continued her pain management program with Dr. Wu through April 2012, with varying degrees of improvement but also reported neck and upper and lower back pain and/or stabilization of one or more of these reported symptoms.

During her most recent appointment on May 30, 2012, at Everest and under the supervision of Jirayos Chintanadilok, M.D., Plaintiff was positive for anxiety, but negative for crying spells, feelings of stress, difficulty concentrating, sadness, sleep disturbance, or suicidal thoughts, and her mental status examination was grossly normal.  R. 505-06. Under the heading "subjective," Plaintiff was negative for arthralgias, back pain, and myalgias regarding her musculoskeletal system and negative for dizziness, headaches, paresthesias, and weakness regarding her neurological system.  Under the heading "objective," Plaintiff is described as well-nourished, in no apparent distress, and tearful.  Under musculoskeletal, it was noted that Plaintiff's gait was slowed; range of motion-she had pain with back flexion and extension; crepitus, tenderness, effusion-she had kyphosis of the spine.  No focal neuro-deficit was noted under neurologic.  R. 506.  Plaintiff's mental status was described as alert and oriented x 3, appropriate affect and demeanor, and good insight and judgment.  The assessment was generalized anxiety disorder that was controlled, although she was unable to stop her medications, but no abuse or tolerance are noted. Xanax was re-filled.  The "plan" did not include any recommendations regarding limitations on Plaintiff's ability to work.  *Id.*

Notwithstanding the ALJ's findings of several severe impairments and documented reports of treatment over several years, importantly, no treating physician,

including Dr. Wu, opined that Plaintiff experienced significant functional limitations or that she was permanently disabled due to her impairments.[4]

Unlike the facts in <u>Bird</u>, there was sufficient medical evidence prior to the relevant time period of Plaintiff's claim for the ALJ to determine whether Plaintiff was disabled and the evidence after her date last insured did not establish she was disabled prior to this date.  No error has been shown.

### B. Substantial Evidence Supports the ALJ's Consideration and Weighing the Medical Evidence

### 1. Dr. Wu

Plaintiff argues that the Commissioner's decision should be reversed because the ALJ failed to properly characterize and weigh the medical evidence from Dr. Wu. Doc. 14 at 9-12.  Acceptable medical sources provide evidence in order to establish whether a claimant has a medically determinable impairment.  These medical sources include licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, and others.  20 C.F.R. § 404.1513(a).  In addition to evidence from the acceptable medical sources, evidence from other sources may be considered to show the *severity* of the claimant's impairment and how it affects their ability to work.  20 C.F.R. § 404.1513(d)(1).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R.

---

[4]  Dr. Wu advised Plaintiff in 2008 and 2009 regarding her posture and to avoid activities that aggravated or triggered her back pain; however, this advice was not continued after June 2009, R. 256.  *See supra* at 5.

§ 404.1527.  When considering medical opinions, the following factors apply for

determining the weight to give to any medical opinion: (1) the frequency of examination

and the length, nature, extent of the treatment relationship; (2) the evidence in support

of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support

an opinion, particularly medical signs and laboratory findings, the more weight" that

opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether

the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5)

other relevant, but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

     The opinion of the claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal

picture of your medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations or brief

hospitalizations."  20 C.F.R. § 404.1527(c)(2).

     The reasons for giving little weight to the opinion of the treating physician must

be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must

specify what weight is given to a treating physician's opinion and any reason for giving it

no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

     The ALJ may discount a treating physician's opinion report regarding an inability

to work if it is unsupported by objective medical evidence and is wholly conclusory.
Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat
differently, the ALJ may discount the treating physician's opinion if good cause exists to
do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be
found when the opinion is "not bolstered by the evidence," the evidence "supports a
contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks
persuasive weight," the opinion is "inconsistent with [the treating physician's own
medical records," the statement "contains no [supporting] clinical data or information,"
the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is
not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1436, 1440;
Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).
Further, where a treating physician has merely made conclusory statements, the ALJ
may afford them such weight to the extent they are supported by clinical or laboratory
findings and are consistent with other evidence as to a claimant's impairments.
Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

        Here, the ALJ considered Dr. Wu's patient notes in light of the relevant medical
evidence contained in his treatment notes and other medical evidence.  R. 22-23.
Dr. Wu provided several diagnoses that were consistent over time.  Dr. Wu's treatment
notes are not medical opinions, however.  Treating physician opinions are assessed in a
special manner as noted above because they are likely to provide a longitudinal picture
of the claimant's medical impairment and "may bring a unique perspective to the
medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations or brief hospitalization."  20 C.F.R. § 404.1527(d)(2).

Plaintiff refers to individual treatment notes of Dr. Wu of Memorial Hospital at Gulfport.  Doc. 14 at11.  Dr. Wu's consistent diagnoses, and the results of treatments (injections and medications), recommendations, including that Plaintiff "keep good posture in daily activity" and "avoid any activity which aggravates her back or neck pain," and Plaintiff's subjective complaints are documented, however, as noted above the latter advice ceased in June 2009.  *See, e.g.*, R. 256, 259, 261, 265, 268, 270, 275; *see also supra* at 5 and n.4.

"Medical opinions are statements from physicians and psychologists . . . [that] reflect judgment about the nature and severity of [the claimant's] impairments."  20 C.F.R. § 404.1527(a)(2).  Medical reports include medical history, clinical and laboratory findings, diagnoses, and treatment.  20 C.F.R. § 404.1513(b).

The ALJ noted that although Plaintiff subjectively complained of back, neck, and bilateral shoulder pain, objective testing generally revealed only mild findings.  R. 22; *see* 20 C.F.R. § 404.1529(c)(2).  An MRI scan of Plaintiff's thoracic spine in September 2007 showed mild disc protrusions in her thoracic and lower cervical spine without neural impingement.  R. 22, 286-87.  Physical examinations were generally unremarkable, revealing no loss of strength, gait disturbances, or neurological abnormalities.  R. 233, 235, 241, 243, 245, 247, 255, 257, 259, 261, 265, 269.  The ALJ also noted that Plaintiff reported improvement in her neck and/or back pain in January and May 2008 after she received cervical and thoracic facet joint injections.  R. 22, 265,

269, 274; *see* 20 C.F.R. § 404.1529(c)(3)(iv).  Plaintiff acknowleged that her neck and/or back symptoms were stable in August and October 2008 and in June and December 2009.  R. 22, 243, 255, 257, 259, 263.

The ALJ did not assign any particular weight to Dr. Wu's treatment notes; however, he considered these notes in light of the other medical evidence.  Aside from suggesting in 2008 and 2009 that Plaintiff "keep good posture in daily activity" and to "avoid any activity which aggravates her back or neck pain," Dr. Wu did not opine that Plaintiff was unable, from a functional standpoint, to perform any work, even though Plaintiff maintained that position throughout her visits with Dr. Wu.  No error has been shown.

### 2.  Dr. Troiano

Plaintiff also argues the ALJ erred when he gave "great weight" to the opinion of Dr. Troiano.  Doc. 14 at 9-10.  The ALJ considered Dr. Troiano's opinion.  R. 23-24.  On January 19, 2011, several months after Plaintiff's date last insured, Dr. Troiano reviewed Plaintiff's medical records and essentially opined she was not disabled. R. 321-28.  Dr. Troiano provided explanations for her assessment that Plaintiff remained capable of performing a modified range of light work during the relevant period.  *Id.* Dr. Troiano reviewed Plaintiff's medical record through September 30, 2010, and noted that, despite Plaintiff's complaints of cervical tenderness and muscle spasm, physical examination showed that her straight leg-raising test was negative and she had no paralumbar spasm, full motor strength, and intact sensation and coordination.  R. 322. Dr. Troiano also noted that MRIs showed no stenosis or neural impingement and

Plaintiff did not require the use of assistive devices.  R. 322.

State agency medical consultants are "highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act."  *See* Social Security Ruling 96-6p.  Their opinions regarding an individual's RFC are entitled to consideration and weight.  20 C.F.R. § 404.1527(e)(2).  The ALJ's RFC assessment is consistent with her opinion and the medical evidence.  No error has been shown.

### C.  Substantial Evidence Supports the ALJ's Credibility Determination of Plaintiff

Plaintiff argues that the Commissioner's decision should be reversed because the ALJ failed to properly apply the three-part pain standard used by the Eleventh Circuit.  Doc. 14 at 12-15.

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson v. Barnhart, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that

only a mental health professional may express an opinion as to the effects of pain.  One

begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and

pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).[5]  Subjective

symptoms can be overstated, so a claimant's subjective allegations of pain or other

symptoms alone will not establish that he is disabled.  42 U.S.C. § 423(d)(5)(A); 20

C.F.R. §§ 404.1528(a), 404.1529(a).

An ALJ may credit subjective pain testimony even if objective evidence is lacking.

But this is merely permissive guidance.  It does not mandate belief in the subjective

testimony where the substantial evidence in the record indicates otherwise.  After all, in

making the credibility finding, the ALJ is directed to articulate the findings based upon

substantial evidence.  Substantial evidence may consist of objective medical findings, a

lack of other objective medical findings, evidence of exaggeration, inconsistencies in

activities of daily living, failure to pursue recommended physical therapy or to take

prescribed medications, and the like.

In this case, the ALJ considered Plaintiff's subjective complaints of pain, her

---

[5]  Although the ALJ did not expressly refer to the three-part part standard, it is
clear that the ALJ's findings, discussion, and citation to 20 C.F.R. § 404.1529, R. 21,
indicate that the pain standard was applied.  Wilson, 284 F.3d at 1226.

credibility, and the relevant medical evidence, and found that "while the record supports some level of functional limitations related to the claimant's impairments, it does not support such significant limitations as alleged by the claimant."  R. 21-24.  The ALJ also noted, however, that the "observations of generally stable examination findings, with some improvement in condition when complaint with conservative treatment, detract[ed] from the credibility of the claimant's allegations as to her functional limitations and severity of her alleged symptoms."  R. 23.  The ALJ gave Dr. Troiano's opinion "great weight" in making his RFC assessment having found that her opinion was "consistent with the longitudinal medical."  R. 23-24.

Thus, Plaintiff's relatively conservative routine course of treatment and the other medical evidence supports the ALJ's determination that the limitations imposed by her physical impairments were not as severe as alleged.  *See* 20 C.F.R. § 404.1529(c).  The ALJ reasonably concluded that Plaintiff had the RFC, through the date last insured, to perform light work with exceptions noted.  R. 21.

Based on the foregoing, substantial evidence supports the ALJ's credibility determination that Plaintiff's statements regarding her symptoms are not entirely credible.

## VI.  Conclusion

Plaintiff has the burden to prove she is disabled.  Moore, 405 F.3d at 1211.  The record does not support Plaintiff's assertion that she was disabled through her date last insured, that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period

of not less than 12 months.  *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A).  Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for Defendant.

      **DONE AND ORDERED** at Tallahassee, Florida, on June 3, 2014.


                 **s/  Charles A. Stampelos**
                 **CHARLES A. STAMPELOS**
                 **UNITED STATES MAGISTRATE JUDGE**